## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MAINE

In re:

BUCKSPORT GENERATION LLC,

Debtor.

Chapter 11
Case No. 15-10802

### AFFIDAVIT OF KYLE NENNINGER IN SUPPORT OF FIRST DAY MOTIONS

I, Kyle Nenninger, being duly sworn, depose and say:

1.      I am employed by, and have a membership interest in, Energy Advisory Partners LLC ("EAP"), a financial advisory firm specializing in the energy industry and retained pre-petition by Bucksport Generation LLC (the "Debtor"), Bucksport Mill LLC ("Bucksport Mill") and AIM Development (USA) LLC ("AIM") under an Agreement to Serve as Restructuring Agent for Bucksport Energy Project dated July 13, 2015.

2.      EAP was retained for the purpose of assisting the Debtor and Bucksport Mill in restructuring and optimizing the profitability of certain energy generation assets described in more detail below and co-owned by Bucksport Mill and the Debtor.  Services provided to the Debtor, Bucksport Mill and AIM include, but are not limited to, restructuring contracts to reduce costs, restructuring operations, and coordinating communications with Verso Paper LLC ("VP") and Verso Maine Power Holdings LLC ("VMPH"), the former owners of the membership interests of Bucksport Mill and the Debtor, respectively.

3.      In addition to retaining the services of EAP, the Debtor also hired me as an employee pursuant to the terms of an At Will Employment Agreement dated July 16, 2015 (the "Nenninger Employment Agreement").

1

4.      On November 3, 2015, the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Maine.  The same day, the following motions were filed (collectively, the "First Day Motions"):

    a.   Motion for Interim and Final Orders: (A) Authorizing Debtor to Obtain Postpetition Financing; (B) Granting Superpriority Claim and Postpetition Senior Security Interest to AIM Development (USA) LLC; (C) Authorizing the Debtor to Use Cash Collateral; and (D) Scheduling a Final Hearing and Granting Related Relief (the "Borrowing and Cash Collateral Motion");

    b.   Motion for Authority to: (A) Pay Pre-Petition Employee Wages, Salaries and Related Payroll Obligations; (B) Make Payments for Which Payroll Deductions Are Made; (C) Continue Employee Benefits Programs and Related Administrative Obligations in the Ordinary Course; and (D) Direct All Financial Institutions to Honor All Related Payment Requests (the "Payroll Motion");

    c.   Motion for Entry of an Order Authorizing the Maintenance of Bank Account and Continued Use of Existing Business Forms and Checks (the "Cash Management Motion");

    d.   Motion for Order, Pursuant to Rule 1007(c) of the Federal Rules of Bankruptcy Procedure, Extending Time to File Schedules and Statement of Financial Affairs (the "Schedules Motion"); and

    e.   Motion for Expedited Hearing and Approval of Shortened Objection Period With Respect to Various First Day Motions (the "Motion for Expedited Hearing").

This Affidavit is submitted in support of these First Day Motions, which are described in greater detail below.

5.      All facts set forth herein are based on my personal knowledge, on information supplied to me by others within the Debtor's organization, upon my review of relevant documents, or on my opinion based on my experience and knowledge of the Debtor's operations, financial condition and present liquidity needs.  If I were called to testify, I could and would testify competently to the facts set forth herein.  Part I of this Affidavit describes certain relevant

2

historical events which are necessary to understand the issues involved in this bankruptcy case. Part II of the Affidavit describes the Debtor's operations as of the Petition Date. Part III details events precipitating this chapter 11 filing and explaining the Debtor's preliminary plans for restructuring under chapter 11. Finally, Part IV sets forth facts relevant to each of the First Day Motions.

## I.     Historical Events

6.      Pre-petition, Verso Bucksport LLC ("Verso Mill"), a wholly owned subsidiary of VP, owned and operated a paper mill located in Bucksport, Maine (the "Mill").

7.      The Mill was powered by certain generation assets which include, *inter alia*, a 21 MW generator, backpressure steam turbine and related equipment (collectively, "G2"), a 72.4 MW Generator, condensing steam turbine and related equipment (collectively, "G3"), a General Electric 7FA 185 MW gas turbine ("G4"), heat recovery steam generator and related equipment ("Boiler 9"), a 25 MW Generator, condensing steam turbine and related equipment (collectively, "G5"),  a gas boiler and related equipment ("Boiler 5"), two oil boilers and related equipment ("Boiler 6 and Boiler 7") and a multi-fuel boiler and related equipment ("Boiler 8"). Collectively, G2, G3, G4, G5, Boiler 5, Boiler 6, Boiler 7, Boiler 8, Boiler 9 and all associated equipment shall be referred to herein as the "Energy Plant".

8.      Other than coordinated shut downs for maintenance purposes or emergencies, the Energy Plant previously operated twenty-four (24) hours per day, seven (7) days per week producing electricity and steam necessary to power the Mill which, until the end of 2014, was operating at full capacity with employees staffing the paper-making facility around the clock in three shifts. In addition, the Energy Plant had the capability to, and did in fact, sell electricity and capacity into the New England energy market.

9.      Prior to February 28, 2014, Bucksport Energy LLC ("Bucksport Energy"), a subsidiary of H.Q. Energy Services (U.S.) Inc. ("Bucksport Energy Parent"), owned a seventy-two percent (72%) interest in G4 and Boiler 9.  Verso Mill owned the remaining twenty-eight percent (28%) interest in G4 and Boiler 9 and one hundred percent (100%) interest in all other assets comprising the Energy Plant and the Mill itself.  Bucksport Energy and Verso Mill jointly operated the Energy Plant pursuant to the following documents:

      a.  Co-Owners Ownership, Operating & Mutual Sales Agreement dated as of December 15, 1998, as subsequently amended by the Amended and Restated Co-Parties Ownership, Operating & Mutual Sales Agreement, dated as of July 27, 1999 (the original agreement and subsequent amendment being collectively referred to herein as the "Verso Co-Owners Agreement"); and

      b.  Ground Lease and Sublease, dated as of December 15, 1998, as amended by the Amended and Restated Ground Lease and Sublease dated as of July 27, 1999 (the original lease and subsequent amendment being collectively referred to herein as the "Verso Ground Lease").

10.     The majority of employees staffing both the Mill and Energy Plant were employed under a collective bargaining agreement (the "Verso CBA") between VP and United Steel Workers Local No. 00261 and Local No. 01188 and the International Brotherhood of Electrical Workers Local No. 1777 (the "Unions").  The Verso CBA had a term beginning May 1, 2011 and ending on October 31, 2015.

11.     In connection with its operation of the Energy Plant, Bucksport Energy entered into a Global O&M Services Business Long Term Service Contract dated as of August 7, 1998 (the "GE LTSA") by and between Bucksport Energy and General Electric International, Inc. ("GE"), pursuant to which GE agreed to provide long term parts and services relating to G4.  The GE LTSA included detailed schedules for planned maintenance and parts replacement to be performed by GE in consideration for certain charges to be paid by Bucksport Energy.

12.    Further, Bucksport Energy Parent entered into the Firm Gas Transportation Service Agreement with Bangor Gas Company ("Bangor Gas"), dated July 15, 1999 (the "Gas Transmission Contract") pursuant to which Bangor Gas agreed to construct, maintain and operate a gas pipeline capable of supplying gas sufficient to support the Energy Plant's continuous operation. In exchange for these transmission services, Bucksport Energy agreed to pay an Annual Transmission Capacity Charge of $1,150,662 to Bangor Gas.

13.    On or about February 28, 2014, Bucksport Energy Parent transferred Bucksport Energy's entire seventy-eight percent (78%) interest in G4 and Boiler 9 to Verso Bucksport Power LLC ("Verso Generation"), a wholly owned subsidiary of VMPH. In connection with that transaction, Bucksport Energy's rights, obligations and liabilities under the GE LTSA and Bucksport Energy Parent's rights, obligations and liabilities under the Gas Transmission Contract were assigned to Verso Generation.

14.    Bangor Gas's consent to the assignment of the Gas Transmission Contract was conditioned upon Verso Generation's execution of a Collateral Agreement pursuant to which Verso Generation deposited $949,540 into an account controlled by Bangor Gas (the "Bangor Gas Collateral"). Bangor Gas asserts a first priority security interest in the Bangor Gas Collateral.

15.    Effective January 1, 2014, GE and Verso Generation entered into Amendment No. 03 to the GE LTSA (the "Verso Generation LTSA Amendment"). The Verso Generation LTSA Amendment, *inter alia*, extended the original term of the GE LTSA and established Annual Milestone Payments of one million dollars ($1,000,000) in 2014, three million five hundred thousand dollars ($3,500,000) in 2015, five million dollars ($5,000,000) in 2016, and

5

three million five hundred thousand dollars ($3,500,000) in 2017 (the "Annual Milestone Payments").

16.     On or about December 5, 2014, VP and VPMH entered into a Membership Interest Purchase Agreement (the "MIPA") with AIM under which AIM purchased all of VP's and VPMH's respective membership interests in their wholly owned subsidiaries, Verso Mill and Verso Generation, respectively.   Post-closing, Verso Generation—now a subsidiary of AIM— continued to be a party under the GE LTSA, as amended, and the Gas Transmission Contract, as amended.   AIM entered into an Employee Leasing Agreement with VP pursuant to which AIM leased employees from VP to staff and operate the Energy Plant for a period commencing on the date on which the MIPA closed and ending on the earlier of April 30, 2015 or such earlier date elected by AIM (the "Employee Leasing Agreement").   The Verso CBA expired on April 30, 2015 without a new collective bargaining agreement in place, however, the Debtor, Bucksport Mill, AIM and its affiliates, agents and successors continued to be bound by its terms under the terms of the Employee Leasing Agreement and applicable labor laws until a new collective bargaining agreement was reached.

17.     The parties closed on the MIPA on or about January 29, 2015.   Soon thereafter Verso Mill's name was changed to Bucksport Mill LLC and Verso Generation's name was changed to Bucksport Generation LLC.   AIM continues to be the sole member of each entity.

**II.     Debtor's Operations**

18.     The Debtor and Bucksport Mill continue to co-own and operate the Energy Plant. Their rights and obligations with respect to those generation assets are governed by the Co-Owners Ownership, Operating and Mutual Sales Agreement by and between Bucksport Mill LLC f/k/a Verso Bucksport LLC and Bucksport Generation LLC f/k/a Verso Bucksport Power

LLC, effective as of January 29, 2015 (the "Co-Owners Agreement") and the Ground Lease

between Verso Bucksport LLC and Bucksport Generation LLC f/k/a Verso Bucksport Power

LLC, effective as of January 29, 2015 (the "Ground Lease"). The Co-Owners Agreement and

the Ground Lease are based upon the terms and conditions set forth in the terminated Verso Co-

Owners Agreement and the Verso Ground Lease.

19.     Contemporaneously with the closing of the MIPA, AIM entered into an Asset

Management Agreement with Consolidated Asset Management Services (Texas), LLC ("CAMS

Texas") pursuant to which CAMS Texas agreed to perform all management, administrative,

compliance and other support services necessary to operate the Energy Plant.

20.     Among other services, CAMS Texas was obligated under the Asset Management

Agreement to manage accounts related to the Energy Plant project, which management included

making deposits into and withdrawing funds from the accounts, and paying expenditures

necessary to fund Energy Plant obligations. Although the accounts were maintained by CAMS

Texas, as a third party manager, all deposits into and disbursements from those accounts were

carefully allocated among the Debtor and Bucksport Mill in accordance with the Accounting &

Allocation Methodology set forth in the Co-Owners Agreement.[1]  CAMS Texas also ensured

compliance with all regulatory requirements, negotiated, obtained and renewed licenses and

permits as necessary, and negotiated with contract counterparties for the provision of goods and

services necessary to the Energy Plant's operations.

21.     Also on January 29, 2015, AIM entered into an Operating and Maintenance

Agreement (the "O&M Agreement" and, together with the Asset Management Agreement, the

---

[1] The Accounting & Allocation Methodology is a comprehensive schedule listing every source of income and operational expense of the Energy Plant; from the cost of lubricants to labor costs on the liabilities side and from capacity payments to renewable energy credits on the asset side. Each of the more than 150 items listed on the Accounting & Allocation Methodology are specifically allocated between and among the Debtor and Bucksport Mill in accordance with each entity's ownership interest in the assets comprising the Energy Plant.

"CAMS Agreements") with Consolidated Asset Management Services (Maine), LLC ("CAMS Maine" and, collectively with CAMS Texas, the "CAMS Entities") pursuant to which CAMS Maine managed the Energy Plant. Payroll for the Energy Plant's employees was—like other operating expenses of the Energy Plant—accounted for in accordance with the Accounting & Allocation Methodology.

22.    While the CAMS Entities undertook the daily operation of the Energy Plant in accordance with their respective obligations under the CAMS Agreements, the CAMS Entities performed those services as agents of Bucksport Mill and the Debtor. Orders were placed on behalf of, and invoiced to, the Debtor and/or Bucksport Mill, as appropriate under the terms of the Co-Owners Agreement. Costs, expenses, assessments and other liabilities were allocated between the Debtor and Bucksport Mill in accordance with the Accounting & Allocation Methodology.

23.    While the Energy Plant is capable of operating in the same way it has in the past, there have been some significant changes in operation. Principally, Bucksport Mill no longer operates the Mill and is currently seeking permits and approvals necessary to demolish that facility. The historically large work force necessary to operate both the Mill and the Energy Plant has shrunk to a pool of just 18 employees who are available to operate the Energy Plant; two of whom are contract employees retained for the sole purpose of restructuring the Energy Plant to increase profitability.

24.    With the closure of the Mill, the need for the Energy Plant to constantly provide steam and electricity to the Mill ended. Accordingly, the Energy Plant no longer operates continuously and now sells energy on a merchant basis and is a participant in the ISO New England's forward capacity market. In that role, the Energy Plant is in a stand by capacity mode

and needs only generate electricity when ISO New England calls upon it to ensure constant availability of electricity on the regional New England grid or is dispatched in the day ahead energy markets if prevailing prices exceed the Energy Plant's costs. Under the applicable ISO New England tariff provisions, the Energy Plant receives capacity payments from ISO in consideration for its continuous availability to produce electricity when called upon to do so by ISO New England (the "Capacity Payments").

25.    On the rare occasion the Energy Plant operates to generate electricity, the Energy Plant receives payment for the electricity it produces for ISO New England (the "Electricity Revenues"). Under the Accounting & Allocation Methodology, the Debtor is entitled to forty-seven percent (47%) of the Capacity Payments and seventy-two percent (72%) of the Electricity Revenues generated by G4. The remaining fifty-three percent (53%) of the Capacity Payments and twenty-eight percent (28%) of the Electricity Revenues generated by G4, plus one hundred percent (100%) of the Electricity Revenues generated by G3 and G5, constitute profits of the Bucksport Mill.

26.    The Energy Plant's change in operations from a continuous source of energy powering the Mill to a merchant generator greatly reduces the amount of natural gas the Energy Plant requires to operate and completely changes the necessary timing and amount of maintenance G4 needs such that the Bangor Gas Contract and GE LTSA are an ill fit for the project.

27.    In an effort to cut costs and increase the Energy Plant's profitability, the Debtor, Bucksport Mill and AIM have, among other things, decided to streamline the Energy Plant's operations by eliminating the CAMS Entities as middle men. To that end, the Debtor entered into a Labor Agreement between Bucksport Generation LLC a Subsidiary of AIM Development

(USA), LLC and United Paper, Steel and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union on Behalf of its Local Union #01188 and the International Brotherhood of Electrical Workers Local No. 1253, effective as of July 1, 2015 (the "CBA").

28.     Further, on September 24, 2015, AIM, the Debtor and the CAMS Entities entered into the Assignment of and First Amendment to the Asset Management Agreement and First Amendment to O&M Agreement (the "CAMS Amendment"), pursuant to which AIM assigned its rights, obligations and liabilities under the CAMS Agreements to the Debtor. Further, the term of the O&M Agreement was shortened to October 15, 2015 and CAMS Texas's role under the Asset Management Agreement was drastically scaled back to an advisory capacity, beginning November 1, 2015. These changes result in a corresponding reduction in CAMS Texas's management fee. The Debtor now employs the remaining eighteen (18) employees—twelve (12) of whom are members of the Unions—and, as of September 18, 2015, maintains its own operating account at Comerica Bank.

29.     The Debtor funded its pre-petition restructuring efforts with a ten million dollar ($10,000,000.00) secured line of credit evidenced by that certain Secured Line of Credit Promissory Note dated September 8, 2015 (the "AIM Note"). On the Petition Date, the outstanding balance under the AIM Note was $9,124,692.27. To secure its obligations under the AIM Note, the Debtor executed a Security Agreement of even date granting AIM a blanket security interest in all of the Debtor's assets.

### III.    Events Precipitating Filing

30.    Although the Debtor undertook significant restructuring efforts pre-petition, the Debtor continues to struggle with historical liabilities which are impossible to satisfy as result of the reduced scope of the Energy Plant's operations.

*A. The GE LTSA*

31.    The Debtor contends that GE breached the GE LTSA pre-petition by failing to provide planned maintenance and combustion inspections in accordance with applicable schedules established in the GE LTSA and, further, by exceeding the recommended replacement interval for parts and failing to repair and replace parts in accordance with the terms of the GE LTSA.

32.    By letter dated April 21, 2015, the Debtor noticed GE that it was in material breach of the GE LTSA and demanded cure of the default by delivery of parts which the Debtor contends were overdue to be delivered. GE failed to cure such defaults in accordance with the terms of the GE LTSA. In its letter dated April 21, 2015, the Debtor also demanded adequate assurance of future performance by GE of obligations under the GE LTSA, but GE failed to respond and provide adequate assurances of future performance within the reasonable time provided by the Debtor. On May 5, 2015, the Debtor provided notice to GE that—as a result of its material breach of contract and failure to provide adequate assurance of performance—the Debtor considered GE to have repudiated the GE LTSA and, further, that such repudiation was final. Based on GE's material breaches and repudiation, the Debtor terminated the LTSA effective May 5, 2015.

33.    The Debtor is asserting a pre-petition claim against GE in the amount of at least $12,558,611.04.

34.    GE, on the other hand, claims the Debtor is in breach of the GE LTSA for failure to make payments due to GE under the GE LTSA.  GE asserts a claim against the Debtor in the amount of $15,058,611.04.

35.    The Debtor intends to commence an adversary proceeding seeking damages for GE's breach and repudiation of the GE LTSA. To the extent the Court finds that the GE LTSA is still in effect the Debtor will reject it.

*B. The Gas Transmission Contract*

36.    The Debtor's predecessor-in-interest, Bucksport Energy, entered into the Gas Transmission Contract at a time when its gas supply needs were significantly greater due to the continuous operation of the Energy Plant.  In the Debtor's current role as a merchant energy plant, the fixed annual contract rate of $1,150,662 is staggeringly high and grossly disproportionate to the transmission services Bangor Gas provides to the Debtor and will provide to the Debtor in the future.

37.    The Debtor has sought—both in direct negotiations with Bangor Gas, and through its participation in Bangor Gas's administrative proceeding before the Maine Public Utilities Commission seeking approval for renewal of a multi-year rate plan—to adjust its rate under the Gas Transmission Contract from a fixed annual rate to a cost of service rate. To date, the Debtor has been unsuccessful in these negotiations.

38.    The Debtor's current operational structure simply does not support its current obligations under the Gas Transmission Contract and, therefore, the Debtor anticipates rejecting the Gas Transmission Contract in this proceeding.

## IV.   The First Day Motions

39.     I reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the motions is necessary if the Debtor is to operate in chapter 11 with a minimum of disruption. Ultimately, these motions will be critical to the Debtors' ability to achieve a successful reorganization.

### A.   Borrowing and Cash Collateral Motion

40.     The Debtor seeks authority to borrow up to ten million dollars ($10,000,000) in debtor in possession financing from AIM (the "DIP Loan") to fund the Debtor's day-to-day operations, working capital needs and restructuring costs in accordance with the budget (the "Budget") attached as Exhibit B to the Borrowing and Cash Collateral Motion. The Debtor further seeks authority to grant AIM, in consideration for the DIP Loan, a "superiority" claim pursuant to section 364(c)(1) of the Bankruptcy Code and a blanket lien in all of its assets, junior only to any valid, enforceable and properly perfected lien of Bangor Gas in the Bangor Gas Collateral. Finally, the Debtor also seeks authority to use Cash Collateral in accordance with the Budget. The terms of the DIP Loan and the use of Cash Collateral are set forth more fully in the Borrowing and Cash Collateral Motion.

41.     AIM is the only prepetition secured creditor holding liens which will be primed as a result of the DIP Loan and is the only prepetition secured lender with a security interest in Cash Collateral. AIM consents to the use of Cash Collateral and DIP Loan proceeds in accordance with the Budget.

42.     The Debtor's only other prepetition secured lender is Bangor Gas, which asserts a first priority security interest in the Bangor Gas Collateral totaling $949,540. The Bangor Gas Collateral secures a potential claim of no more than $383,554 and, therefore, Bangor Gas enjoys

an equity cushion of at least $565,986 in the Bangor Gas Collateral. As AIM is not priming Bangor Gas's lien in the Bangor Gas Collateral, and that creditor enjoys a substantial equity cushion, Bangor Gas is unaffected by the relief sought herein and its interests are adequately protected.

43.     The Debtor requires the use of the DIP Loan funds and Cash Collateral in order to continue operating during this Chapter 11 case. Without the DIP Loan, even with the use of Cash Collateral, the Debtor would become unable to pay general operating expenses within a short period, including, without limitation, employee payroll and other benefits and operational costs allocated to the Debtor under the Accounting & Allocation Methodology. Upon the Debtor's inability to pay its general operating expenses, the Debtor would have to liquidate, resulting in the destruction of substantial value that would otherwise inure to the benefit of the Debtor's stakeholders.

44.     The credit provided under the DIP Documents, together with the use of Cash Collateral, will enable the Debtor to pay its employees and otherwise operate its business during the pendency of this Chapter 11 case, thereby preserving and enhancing the value of its estate for the benefit of all parties in interest.

*B. Payroll Motion*

45.     The Debtor has eighteen (18) employees. Twelve (12) employees are hourly wage earners (the "Hourly Employees") and six (6) employees are salaried personnel (the "Salaried Employees" and, together with the Hourly Employees, the "Employees"). The Hourly Employees are represented by the Unions and the terms of their employment are governed by the CBA.

14

46.     The Employees perform a variety of critical functions, including management, operation, mechanical and electrical maintenance and administration of the Debtor. The Employees' skills, knowledge, and understanding of the Debtor's infrastructure, assets and operations are essential to the effective operation of the Debtor's business and to a successful reorganization of that business in a fashion that maximizes the return to creditors and other parties-in-interest of the estate.

47.     Just as the Debtor depends on the Employees to operate its business on a daily basis, these individuals also depend on the Debtor. Indeed, the vast majority of these individuals rely exclusively on payments received from the Debtor for their basic living necessities. Accordingly, the Debtor seeks authority to pay the Debtor's prepetition employee wages and salaries; (b) make payments for which payroll deductions are made, including health insurance premiums; (c) make payments to the Debtor's employee retirement plans and to fund certain health and dental costs and expenses; and (d) pay all costs incident to the foregoing payments (including payroll-related taxes and processing costs).

48.     As of the Petition Date, the Employees were owed and had accrued various sums for wages and salaries. In addition, as of the Petition Date, the Debtor had outstanding obligations for certain payroll deductions, including union dues, employee retirement plan contributions, and all costs incident to the foregoing payments, including payroll related taxes and processing costs. The obligations are coming due on November 12, 2015 and relate to the period beginning October 25, 2015 and continuing through November 7, 2015 (the "Payroll Period"). The obligations incurred during the pre-petition portion of the Payroll Period constitute pre-petition claims.

49.     During a typical pay period, Employees accrue, on average, approximately $51,244.00 in straight wages and salary, before deductions, plus approximately $2,238.00 in additional compensation in the form of matching retirement contributions, profit sharing payments and other benefits. As set forth more fully in the Payroll Motion, the Debtor expects to withhold approximately $14,309.00 in federal and state taxes and to deduct approximately $11,381.00 in employee benefit deductions during the Payroll Period.

50.     The Debtor seeks authority: (a) to pay to Employees the total gross compensation, net of the tax withholdings and employee benefit deductions; (b) to pay to the tax withholdings to the appropriate state and federal taxing authorities; (c) to make payments for which employee benefit deductions are made, including health insurance premiums, retirement plan contributions, union dues and other employee benefits; and (d) pay all costs incident to the foregoing payments, such as the payroll processing fee payable to the Debtor's payroll servicer Paychex, Inc. (collectively, the "Prepetition Compensation").

51.     Although the Prepetition Compensation will be fully funded from the Debtor's operating account, only forty-seven percent (47%) of those obligations constitute liabilities of the Debtor under the Accounting & Allocation Methodology. The remaining fifty three percent (53%) of the Total Gross Compensation is credited against the Bucksport Mill Trust Funds.

*C.  Cash Management Motion*

52.     The Debtor filed the Cash Management Motion seeking an order, *inter alia*: (1) authorizing the Debtor to continue using its sole financial account, an operating account maintained at Comerica Bank (the "Account"); (2) authorizing the Debtor to continue using existing business forms; and (3) finding that Fed. R. Bank. P. 6003 is satisfied.

53.    As set forth more fully in the Cash Management Motion, the Debtor opened the Account on or about September 18, 2015 as part of its pre-petition restructuring efforts and, more specifically, in conjunction with its efforts to phase out the CAMS Entities as project managers and operators.

54.    All of the Capacity Payments and Electricity Revenues received by the Energy Plant are deposited into the Account.  In accordance with the Co-Owners Agreement and the Accounting & Allocation Methodology, fifty-three percent (53%) of the Capacity Payments, twenty-eight percent (28%) of the Electricity Revenues generated by G4 and one hundred percent (100%) of the Electricity Revenues generated by G3 and G5 constitute profits of Bucksport Mill and are held in trust in the Account for the benefit of that entity (the "Bucksport Mill Trust Funds").  All of the Energy Plant's operating expenses are paid from funds in the Account.  Expenses which are allocated as liabilities of Bucksport Mill under the Accounting & Allocation Methodology are debited against the Bucksport Mill Trust Funds (the "Bucksport Mill Expenses").  Quarterly, the Debtor pays to Bucksport Mill the Bucksport Mill Trust Funds, net of any Bucksport Mill Expenses.

55.    The Debtor requires continued use of the Account in order to avoid disruption to the sophisticated and comprehensive Accounting & Allocation Methodology which, in turn, would likely result in delayed payments to, and confusion among, vital vendors and suppliers. Any interruption in these relationships would likely impair the Debtor's ability to maintain the Energy Plant's status as a stand by capacity generator, causing it to breach its obligations under applicable ISO New England tariff provisions.  Moreover, any requirement to open a new account may delay the Debtor's ability to fund payroll and related expenses coming due on November 12, 2015.

56.    Since the Account was established less than two months prior to the Petition Date, the typical reasons for requiring debtors to open new debtor-in-possession accounts post-petition are inapplicable in this case. Accordingly, the time and expense of opening a new account would cause the Debtor to incur additional costs and deplete assets of the estate without providing any benefit to the Debtor's creditors. Under the circumstances, the maintenance of the Account is both essential to the Debtor's business and in the best interests of the Debtor's estate.

57.    For similar reasons, the Debtor also seeks authority to continue using its correspondence, business forms (including, but not limited to, letterhead, purchase orders, and invoices) and checks (collectively, the "Business Forms") existing immediately before the Petition Date without reference to the Debtor's status as a debtor-in-possession.

58.    Parties doing business with the Debtor will undoubtedly be aware of the Debtor's status as a debtor-in-possession as a result of press coverage and noticing. Moreover, if the Debtor were required to change its Business Forms, it would be forced to choose standard forms rather than the current forms with which the Debtor's vendors and suppliers are familiar. Such a change in operations would create a sense of disruption and potential confusion within the Debtor's organization and confusion for the Debtor's vendors and suppliers. The Debtor believes that it would be extremely costly and disruptive to cease using all existing Business Forms and to purchase and begin using new stationery, business forms, and checks. The Debtor respectfully submits that to do so would be unnecessary and that appropriate care can be taken to assure the proper use of the existing forms.

59.    Finally, the Debtor seeks authority under Fed. R. Bank. P. 6003 to continue operating the Account in the ordinary course of business. This relief is particularly necessary in this case where the Account includes both the Debtor's operating cash and the Bucksport Mill

18

Trust Funds and expenses paid from the Account constitute liabilities the Debtor and/or Bucksport Mill, as determined by the Accounting & Allocation Methodology.

### D. Schedules Motion

60.     The Debtor seeks authority to extend the deadline for filing schedules and a statement of financial affairs (the "Schedules") to sixty (60) days after the Petition Date.  As the Debtor states more fully in the Schedules Motion, several factors weigh in favor of allowing the Debtor additional time to gather information necessary to accurately and thoroughly complete its schedules.

61.     Specifically, AIM only acquired the Debtor's membership interests when AIM and the Verso entities closed on the MIPA on January 29, 2015.  At the time of the closing, all of the Debtor's officers and directors withdrew and were replaced with an entirely new management team.  While the Debtor continues to be the same corporate entity, much of the historical knowledge regarding the company's operations, assets, liabilities and financial condition was lost in the change in management.

62.     The Schedules require the Debtor to provide information on a wide variety of topics dating back at least one year and, in some cases, two years.  While AIM performed due diligence in connection with the Stock Purchase Transaction, that process did not produce all of the information the Debtor is required to disclose in the Schedules.  Accordingly, in order to accurately and thoroughly complete the Schedules, the Debtor will be required to seek information from prior officers, directors, employees and agents of the Debtor, as well as prior counsel to the Debtor.

63.     Relevant information regarding the Debtor's assets, liabilities, operations and financial condition since the stock purchase transaction will be only slightly easier to obtain.

The CAMS Entities—in their roles as asset managers and operators of the Energy Plant—performed many of the day-to-day functions necessary to operate the Energy Plant in the eight months following the Stock Purchase Transaction.  Accordingly, the Debtor will need to coordinate with those entities to obtain necessary information to complete the Schedules with respect to the past eight months.

64.     Obtaining information from both periods—pre-stock transaction and post-stock transaction—will be time consuming and require both Debtor and its counsel to reach out to a number of unaffiliated third parties.  Extending the time for filing the Schedules would not only ensure that the Debtor is able to produce accurate and thorough schedules, it will also enable Debtor's management and counsel to prioritize the Debtor's obligations as a debtor-in-possession.

*E. Motion for Expedited Hearing*

65.     The Debtor requires expedited relief with respect to the First Day Motions to: allow the Debtor the ability to pay certain prepetition obligations incurred in the ordinary course of business; maintain relationship with customers, vendors, the Unions and the ISO New England, among others; obtain financing and authority to use cash collateral for the purpose of funding post-petition obligations and restructuring efforts; and preserve the estate by minimizing unnecessary expenses, delays and other disruptions to the Debtor's operations.

Dated: November 2 2015

Kyle Nenninger

STATE OF MAINE
CUMBERLAND, SS.

Personally appeared the above-named Kyle Nenninger and acknowledged the foregoing to be true to the best of his personal knowledge, information and belief.

Before me

Notary Public
My Commission Expires     10/21/17

AUBREY L. CUMMINGS
Notary Public, Maine
My Commission Expires October 21, 2017