**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>BUCKSPORT GENERATION, LLC,<br><br>Debtor. | Chapter 11<br>Case No. 15-10802 |

**MOTION FOR INTERIM AND FINAL ORDERS: (A) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING; (B) GRANTING SUPERPRIORITY CLAIM AND POSTPETITION SENIOR SECURITY INTEREST TO AIM DEVELOPMENT (USA) LLC; (C) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL; AND (D) SCHEDULING A FINAL HEARING AND GRANTING RELATED RELIEF**

Bucksport Generation, LLC, the debtor and debtor-in-possession in the above-captioned Chapter 11 case (the "Debtor"), by and through its attorneys, hereby moves this Court (the "Motion") to enter interim and final orders pursuant to sections 105(a), 361, 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the Bankruptcy Court for the District of Maine (the "Local Rules") authorizing the Debtor to obtain postpetition financing from AIM Development (USA) LLC ("AIM") on an interim basis, authorizing the use of cash collateral on an interim basis, scheduling a final hearing on the Motion, and granting related relief set forth in more detail below. In support of the Motion, the Debtor respectfully states as follows:

1

## CONCISE STATEMENT OF RELIEF REQUESTED[1]

Pursuant to Bankruptcy Rule 4001(c)(1)(B) and (d)(1)(B), the Debtor provides the following concise statement of the relief requested. By this Motion, the Debtor seeks entry of the Interim and Final Orders providing the following relief:

(a) Authorizing the Debtor to obtain postpetition financing (the "DIP Loan") from AIM consisting of a secured line of credit in the maximum principal amount of ten million dollars ($10,000,000.00) (the "Loan Amount") pursuant to the Secured Line of Credit Promissory Note (the "DIP Note") and the Security Agreement (the "DIP Security Agreement" and, collectively with the DIP Note, the "DIP Documents"),[2] which DIP Loan constitutes "new money" to fund the Debtor's day-to-day operations, working capital needs and restructuring costs in accordance with the budget attached as **Exhibit B** (the "Budget"); which generally provides for:

(b) Authorizing the Debtor to enter into the DIP Documents and approving the DIP Documents;

(c) Pursuant to Bankruptcy Code section 364(c)(1), granting superpriority claim status to AIM to the extent of any outstanding balance under the DIP Loan (the "DIP Superpriority Claim"); provided, however, that the DIP Superpriority Claim shall be subject to the Carve-Out Expenses;[3]

(d) Pursuant to Bankruptcy Code section 364(d), as security for the repayment of the obligations arising under the DIP Documents, authorizing the Debtor to grant to AIM first priority security interests in and liens upon (the "DIP Liens") all of the Debtor's assets and interests (the "DIP Collateral"); provided, however, the DIP Liens shall be subject to the Carve-Out Expenses and to the Bangor Gas Lien (as defined below) to the extent such lien is valid, enforceable and properly perfected;

(e) Pursuant to Bankruptcy Rule 4001(c)(2), scheduling a preliminary hearing on this Motion and authorizing the Debtor to borrow up to $60,000 (the

---

[1] Capitalized terms used but not defined in this Concise Statement of Relief Requested shall have the meanings ascribed to such terms below. Cross-references to the DIP Documents and the Interim Order as required by Bankruptcy Rule 4001(c) are set forth at pages 5-6.

[2] The DIP Documents are attached hereto as **Exhibit A**.

[3] The "Carve-Out Expenses" means an amount sufficient to satisfy, collectively: (i) the statutory fees payable to the Office of the United States Trustee (the "U.S. Trustee") pursuant to 28 U.S.C. § 1930(a)(6), plus accrued interest thereon (if any); (ii) fees payable to the Clerk of this Court; and (iii) the unpaid and outstanding reasonable fees and expenses actually incurred on or after the Petition Date, and approved by a final order of the Court pursuant to the Bankruptcy Code by attorneys, accountants, investment bankers and other professionals retained by the Debtor, in a cumulative, aggregate sum not to exceed $300,000. See Interim Order, ¶ 11.

2

          "Interim Amount") during the period from the Interim Hearing up through and including the week ending December 6 (the "Interim Period");

(f)      Pursuant to Bankruptcy Code section 362, modifying the automatic stay to the extent set forth in the DIP Documents and the DIP Orders;

(g)      Pursuant to Bankruptcy Code section 363(c)(2)(A), approve and authorize the consensual use of cash collateral pursuant in accordance with the Budget; and

(h)      Pursuant to Bankruptcy Rule 4001(c)(2), scheduling the Final Hearing and granting related relief.

## JURISDICTION, VENUE AND PREDICATES FOR RELIEF

1.      The United States District Court for the District of Maine (the "District Court") has original, but not exclusive, jurisdiction over the Debtor's Chapter 11 case pursuant to 28 U.S.C. § 1334(b). Pursuant to 28 U.S.C. § 157 and Rule 83.6 of the District Court's local rules, the District Court has authority to refer and has referred this proceeding to this Court.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and this Court has constitutional authority to enter final judgment in this proceeding.

3.      Venue over this Chapter 11 case is proper in this district pursuant to 28 U.S.C. § 1408, and venue over this proceeding is proper in this district pursuant to 28 U.S.C. § 1409.

4.      The predicates for relief sought herein are Bankruptcy Code sections 105(a), 361, 362, 363 and 364, Bankruptcy Rule 4001(c) and Local Rule 4001-2.

## BACKGROUND

**A.**     **The Chapter 11 Case**

5.      On November 3, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business as a debtor in possession pursuant to Bankruptcy Code sections 1107 and 1108. As of

the date hereof, no trustee or examiner has been sought or appointed in the Debtor's Chapter 11 case, and no official committee has been appointed.

6. Additional background information regarding the Debtor and the relief sought by this Motion and relating to the marketing, reasonableness and necessity of the DIP Loan is set forth in the <u>Affidavit of Kyle Nenninger in Support of First Day Motions</u> (the "<u>Nenninger Affidavit</u>"), which was filed on the Petition Date and which is incorporated by reference herein.

### B. The Debtor's Prepetition Assets and Secured Debt

7. Prior to the Petition Date, on or about September 8, 2015, the Debtor and AIM entered into certain loan agreements (all loan documents giving rise to the prepetition obligations owed to AIM are collectively referred to herein as the "<u>Prepetition Loan Documents</u>") pursuant to which AIM provided to the Debtor a line of credit of up to ten million dollars ($10,000,000) (the "<u>Prepetition LOC</u>"). As of the Petition Date, the Debtor's balance under the Prepetition LOC was $9,124,692.27 (the "<u>Prepetition LOC Balance</u>"). The Prepetition LOC Balance is secured by a blanket security interest in substantially all of the Debtor's assets (the "<u>Prepetition AIM Liens</u>"). AIM is the only creditor with a security interest in Cash Collateral and has consented to the use of Cash Collateral in accordance with the Budget.[4]

8. On or about February 28, 2014, the Debtor (t/d/b/a Verso Bucksport Power LLC) acquired from Bucksport Energy LLC ("<u>BELLC</u>") that entity's seventy-eight percent (78%) interest in certain energy generation assets described more fully in the Nenninger Affidavit. As part of that transaction, BELLC assigned to Debtor its rights, interests and obligations under a Firm Gas Transportation Service Agreement with Bangor Gas Company ("<u>Bangor Gas</u>") dated July 15, 1999 (the "<u>Gas Transmission Contract</u>"). Bangor Gas conditioned its consent to

---

[4] The term "<u>Cash Collateral</u>" shall have the meaning set forth in section 363(a) of the Bankruptcy Code.

4

assignment of the Gas Transmission Contract upon the Debtor's execution of a Collateral Agreement pursuant to which the Debtor deposited $949,540 into an account controlled by Bangor Gas (the "Bangor Gas Collateral"). Bangor Gas asserts a first priority security interest in the Bangor Gas Collateral (the "Bangor Gas Lien").[5] The Prepetition AIM Lien in the Bangor Gas Collateral is junior to the Bangor Gas Lien, to the extent the Bangor Gas Lien constitutes a valid, enforceable and properly perfected security interest.

9. The Debtor is not aware of any other liens or security interests in its property and neither a registry search nor a review of the Secretary of State's UCC filings indicated the existence of any other liens or security interests.

C. **Key Provisions of the DIP Loan**

10. The DIP Loan will bear interest at the rate of one percent (1.00%) per annum and be secured by the DIP Liens on the DIP Collateral. See DIP Note at 1. As set forth more fully in the DIP Security Agreement, the DIP Collateral comprises substantially all the Debtor's assets, including, *inter alia*: (i) cash and accounts (collectively, the "Cash Collateral"); (ii) personal property, fixtures and equipment; and (iii) the Debtor's interest in any agreements pursuant to which the Debtor possesses, uses or had authority to possesses or use, property of others, including, but not limited to, the Debtor's rights under the Ground Lease between Verso Bucksport LLC and Bucksport Generation LLC f/k/a Verso Bucksport Power LLC, effective as of January 29, 2015.[6] The DIP Collateral does not include any chapter 5 avoidance actions or the proceeds thereof. See Local Rule 4001-2(c)(4); DIP Security Agreement, ¶ 1. The liens on the DIP Collateral will prime the Prepetition AIM Liens, but will be junior to the Bangor Gas

---

[5] Nothing herein shall be construed to waive the Debtor's right to challenge the validity, enforceability or priority of the Bangor Gas Lien and the Debtor hereby reserves all rights to raise any such challenge(s).

[6] The Debtor does not own any real property.

Lien, to the extent Bangor Gas Lien is valid, enforceable and properly perfected. See Interim Order, ¶¶ N, 5. The DIP Liens will be automatically perfected without further action by AIM. See Interim Order, ¶ 6.

11. The Debtor's use of funds under the DIP Documents will be governed by the Budget. The Debtor will not deviate from the aggregate expenses detailed in the Budget by more than 10% on a cumulative basis.

12. In accordance with Local Rule 4001-2, the DIP Documents do not contemplate: (a) any release or waiver of defense by the Debtor; (b) the grant of a security interest in chapter 5 avoidance actions or the proceeds thereof; or (c) relief for AIM from the stay without further order or hearing upon an event of default. See Local Rule 4001-2(c). The DIP Orders (as defined below) do, however, include a stipulation by the Debtor as to the validity of the Prepetition AIM Liens (subject to challenge (x) by any official committee appointed, and no other party, within sixty (60) calendar days from the earlier of (i) entry of an order authorizing any such committee's retention of counsel and (ii) entry of an order appointing a Chapter 11 trustee, or (y) in the event no such committee is appointed within thirty (30) days following the Petition Date, by any party in interest with requisite standing within seventy-five (75) calendar days from the date of entry of the Interim Order). See Local Rule 4001-2(c)(1); Interim Order, ¶¶ F, 12.

## RELIEF REQUESTED

13. By this Motion, the Debtor (i) seeks authority (a) to execute the DIP Documents, (b) to grant AIM the DIP Superpriority Claim and the DIP Liens in the DIP Collateral, and (c) for AIM and the Debtor to take such steps as may be necessary or appropriate to implement the foregoing, and (d) to use Cash Collateral in accordance with the Budget; and (ii) requests that this Court schedule the Final Hearing and grant related relief.

14. The Debtor requests that the Court first conduct an emergency preliminary hearing (the "Interim Hearing") authorizing the Debtor to (a) borrow the Interim Amount immediately for use during the Interim Period, in accordance with the terms of a proposed interim order substantially in the form filed in relation to this Motion (the "Interim Order"), and (b) use Cash Collateral with the consent of AIM in accordance with the Budget, as authorized by the Interim Order. The Debtor further requests that the Court schedule the Final Hearing to occur no later than December 4, 2015 to consider entry of an order authorizing the Debtor to (x) borrow the Loan Amount on a permanent basis on terms substantially similar to those set forth in the Interim Order and (y) use Cash Collateral on a permanent basis in accordance with the Budget, all pursuant to a final order approving the Motion (the "Final Order" and, together with the Interim Order, the "DIP Orders").[7]

## BASIS FOR RELIEF

### A. The Legal Standard

15. Bankruptcy Code section 363(c)(2) provides that a debtor may not use, sell, or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

16. Bankruptcy Code section 364(c) provides that:

If the [debtor] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt–

    (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

    . . . .

---

[7] Due to the Thanksgiving holiday, the Debtor is seeking authority to borrow on an interim basis December 6, 2015. The Debtor will file a form of Final Order approving this Motion in advance of the Final Hearing.

11 U.S.C. § 364(c). Pursuant to Bankruptcy Code section 364(d)(1), a debtor may incur a debt secured by a senior lien on property of the estate that is subject to a lien if (a) more favorable financing is not available and (b) the holder of the existing lien on the property on which the senior lien is to be granted is adequately protected. See 11 U.S.C. § 364(d)(1). A creditor's consent to the priming of its lien satisfies the requirement that such lender be adequately protected. See Anchor Savs. Bank v. Sky Valley, Inc., 99 B.R. 117, 122 (N.D. Ga. 1989) (even tacit consent to imposition of a priming lien via withdrawal of objection "relieved the debtor of having to demonstrate that [lienholders] were adequately protected").

17. Pursuant to Bankruptcy Code section 364(e), any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under Bankruptcy Code section 364 shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." See 11 U.S.C. § 364(e). Courts generally hold that "good faith" in the context of postpetition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned. See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)).

18. Additionally, section 105(a) authorizes the Court to issue any order that is necessary or appropriate to carry out the provisions of Title 11. See 11 U.S.C. § 105(a). Finally, Bankruptcy Rule 4001(c)(2) permits courts to authorize a debtor to obtain credit on shorter than 15 days' notice "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c)(2); see also Local Rule 4001-2(e).

**B.    The Only Creditor with an Interest in Cash Collateral Has Consented to Its Use**

19. The Debtor requires the use of Cash Collateral to pay operating expenses set forth in the Budget including, but not limited to, employee payroll and benefits and other operational

costs allocated to the Debtor under the Accounting & Allocation Methodology attached to the Co-Owners Ownership, Operating and Mutual Sales Agreement by and between Bucksport Mill LLC f/k/a Verso Bucksport LLC and Bucksport Generation LLC f/k/a Verso Bucksport Power LLC, effective as of January 29, 2015.  See Nenninger Affidavit, ¶ 20, n. 1.  As previously noted, AIM—the only creditor with an interest in Cash Collateral—has consented to the Debtor's use of Cash Collateral in accordance with the Budget.  Accordingly, the Debtor has satisfied Bankruptcy Code section 363(c)(2) and should be authorized to use Cash Collateral to pay the expenses set forth in the Budget.

  **C.**   **The Debtor Has Satisfied the Requirements for Bankruptcy Code Sections 364(c) and 364(d)**

  20.  By this Motion, the Debtor seeks authority to borrow the Interim Amount pursuant to the Interim Order and the Loan Amount pursuant to the Final Order in exchange for providing AIM with the DIP Superpriority Claim on account of, and the DIP Liens to secure, the obligations arising under the DIP Loan.  The Debtor submits that it has satisfied the requirements of Bankruptcy Code sections 364(c) and (d) and that the DIP Loan, on the terms set forth herein and in the attached DIP Documents, is in the best interests of the Debtor's estate.

  21.  In order to operate during this Chapter 11 case, the Debtor needs obtain debtor-in-possession financing.  Without the DIP Loan, even with the use of Cash Collateral, the Debtor would become unable to pay general operating expenses within a short period, resulting in increased administrative liabilities and a substantial diminution in the value of the Debtor's estate.  Upon the Debtor's inability to pay its general operating expenses, the Debtor would have to liquidate, resulting in the destruction of substantial value that would otherwise inure to the benefit of the Debtor's stakeholders.

22.     The credit provided under the DIP Documents, together with the use of Cash Collateral, will enable the Debtor to pay its employees and otherwise operate its business during the pendency of this Chapter 11 case, thereby preserving and enhancing the value of its estate for the benefit of all parties in interest.

23.     Bankruptcy Code section 364 requires that a debtor have made a reasonable effort to seek credit from other sources available, but an exhaustive search is not required.  See 11 U.S.C. §§ 364(c), (d); see also Snowshoe, 789 F.2d at 1088; 495 Central Park Ave., 136 B.R. at 630-31; Reading Tube, 72 B.R. at 332.  The relatively limited value of the Debtor's assets, coupled with significant projected losses evidenced in the Budget, make it impossible for the Debtor to obtaining financing from an alternative source on competitive terms.  AIM is willing to fund the DIP Loan to protect its pre-petition investment.  Accordingly, the Debtor has satisfied its burden of establishing the unavailability of alternative financing on more favorable terms.

**D.    The Other Secured Creditors Have Consented to or Are Adequately Protected for the Priming of Their Interests**

24.     Bankruptcy Code section 364(d) requires that adequate protection be provided to account for the priming of a prepetition secured creditor's lien unless the creditor consents to the priming.  See 11 U.S.C. § 364(d); Anchor, 99 B.R. at 122 (consenting to imposition of a priming lien "relieved the debtor of having to demonstrate that [lienholders] were adequately protected"). AIM is the only prepetition secured creditor holding liens which will be primed as a result of the DIP Loan and that creditor has consented to the priming of the Prepetition AIM Liens.  AIM therefore requires no adequate protection.   See Anchor, 99 B.R. at 122.

25.     The Debtor's only other prepetition secured lender is Bangor Gas, which asserts a first priority security interest in the Bangor Gas Collateral totaling $949,540.  The Bangor Gas Collateral secures the Debtor's obligations under the Gas Transmission Contract which expires

in January 2016.  The Gas Transmission Contract contains a liquidated damages provision which limits damages in the event of a breach to all remaining Transmission Capacity Charges for the then current agreement year, plus all remaining Transmission Capacity Charges for each remaining agreement year.  Under the terms of the Gas Transmission Contract, Bangor Gas is entitled to receive Transmission Capacity Charges in the amount of $1,150,662 per agreement year.  As of the Petition Date, the Debtor had paid approximately $767,108 of the Transmission Capacity Charges for this, the current and final, agreement year.  Accordingly, the most Bangor Gas could claim in liquidated damages in the event of a breach under the Gas Transmission Contract is $383,554.  Accordingly, Bangor Gas enjoys an equity cushion of at least $565,986 in the Bangor Gas Collateral.  As AIM is not priming the Bangor Gas Lien, that creditor is unaffected by the relief sought herein and its interests are adequately protected.

26.   Because AIM has consented to the priming of the Prepetition AIM Liens and Bangor Gas is adequately protected by its equity cushions and superior lien in the same, the Debtor has satisfied Bankruptcy Code section 364(d) and the DIP Loan should be approved.

E.    **The DIP Facility Was Negotiated in Good Faith and AIM Should Thus Be Afforded the Protection of Bankruptcy Code Section 364(e)**

27.   The terms of the DIP Loan are reasonable in light of the Debtor's financial condition and were negotiated between AIM and the Debtor in good faith.  The Debtor, therefore, respectfully submits that in negotiating and extending the DIP Loan, AIM's conduct was characterized by "honesty in fact."  See Ellingsen MacLean Oil, 834 F.2d at 605 (finding "honesty in fact" in the conduct constituted good faith).  Accordingly, AIM is a "good faith" lender and thus should be afforded the protections of Bankruptcy Code section 364(e).

**F.      Modification of the Automatic Stay**

28.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The proposed DIP Loan contemplates a limited modification of the automatic stay to the extent necessary to permit AIM to perform any act authorized or permitted under, or by virtue of, the Interim Order or the DIP Documents.  Limited stay modification provisions of this type are standard features of debtor-in-possession financing facilities and, in the Debtor's business judgment, such a provision is reasonable under the present circumstances.  Accordingly, the Debtor respectfully requests that the Court authorize the limited modification of the automatic stay in accordance with the terms set forth in the Interim Order.

**G.      The Use of Cash Collateral and the Interim Amount of the DIP Loan Should Be Approved on an Interim Basis**

29.     As set forth above, Bankruptcy Rule 4001 and Local Rule 4001-2(e) provide that a final hearing on a motion to use cash collateral or obtain credit may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, this Court is empowered to conduct a preliminary, expedited hearing on the motion and to authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Fed. R. Bankr. P. 4001(b)(2), (c)(2); Local Rule 4001-2(e).

30.     Authorization to use Cash Collateral and enter into the DIP Documents as requested herein is necessary on an interim basis in order to avoid immediate and irreparable harm to the Debtor.  As set forth more fully in the Nenninger Affidavit, the Debtor co-owns and operates its energy generation facility (the "Energy Plant") with affiliate Bucksport Mill LLC.  In order to continue participating in the forward capacity market—and receive the capacity payments and electricity generation revenues which constitute the Debtor's sole source of

income—the Energy Plant must remain continuously available to generate electricity when called upon to do so by the ISO New England.

31. If the Debtor does not obtain authority to use Cash Collateral or enter into the DIP Documents on an interim and final basis, the Debtor will be unable to pay operational costs necessary to maintain its status as a capacity generator. Moreover, the Debtor will be unable to pay certain administrative expenses such as payroll and employee benefits. As administrative liabilities accrue operating cash will taper off resulting in a significant diminution in the value of the Debtor's estate, thereby jeopardizing the Debtor's ability to reorganize for the benefit of its creditors.

32. The Debtor respectfully requests that this Court schedule and conduct a preliminary hearing on the Motion and authorize the Debtor to (a) obtain credit in the Interim Amount during the Interim Period under the terms that will be contained in the DIP Documents, as set forth in the Commitment Letter, and (b) authorize the use of Cash Collateral on an interim basis. In addition, the Debtor further respectfully requests that this Court schedule the Final Hearing to consider entry of the Final Order.

33. The Debtor further requests that the Court authorize and direct all applicable financial institutions to receive, process, honor and pay all Outstanding Checks, listed in detail on **Exhibit D** attached hereto. The Debtor believes that voiding, returning, or otherwise refusing to pay any of the Outstanding Checks will unnecessarily disrupt the Debtor's operations, harm its relationship with certain key vendors, and otherwise be detrimental to the Debtor's ability to reorganize. Although the Debtor believes that honoring the Outstanding Checks is not unauthorized under 11 U.S.C. § 549, and that most of the Outstanding Checks will likely have

cleared by the date of the hearing on this motion, the Debtor seeks, out of an abundance of caution, explicit authorization permitting the Outstanding Checks to be honored.

## NOTICE

34. Notice of this Motion and the Interim Hearing was served on the following parties on the date on which the Motion was filed by CM/ECF, e-mail, facsimile, or overnight mail: (a) the U.S. Trustee; (b) the Debtor's secured creditors or, if applicable, the lawyers representing such creditors; (c) the non-insider holders of the twenty largest unsecured claims against the Debtor or, if applicable, the lawyers representing such holders; and (d) applicable federal and state taxing authorities ((a) through (d) collectively, the "Notice Parties").

## CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that this Court enter an order: (1) authorizing the Debtor to borrow under the DIP Loan from AIM in accordance with the DIP Documents; (2) authorizing the Debtor, pursuant to 11 U.S.C. §§ 105(a), 361, 362 and 364(c) and (d), to grant AIM the DIP Superpriority Claim and the DIP Liens in the DIP Collateral; (3) authorizing the Debtor and AIM to execute the DIP Documents and take such other steps as may be necessary or appropriate to implement the foregoing; (4) authorizing the Debtor to use Cash Collateral on an interim basis and in accordance with the Budget; (5) scheduling a Final Hearing on the Motion; (6) authorizing and directing all applicable financial institutions to receive, process, honor and pay all Outstanding Checks; and (7) providing such other and further relief as is just and appropriate.

| | |
|---|---|
| Dated:  November 3, 2015 | BUCKSPORT GENERATION, LLC |

By its proposed attorneys:

*/s/ Robert J. Keach, Esq.*
Robert J. Keach, Esq.
D. Sam Anderson, Esq.
Jessica Lewis, Esq.
BERNSTEIN, SHUR, SAWYER & NELSON, P.A.
100 Middle Street
P.O. Box 9729
Portland, ME 04104-5029
Tel: (207) 774-1200
Email: rkeach@bernsteinshur.com
         sanderson@bernsteinshur.com
         jlewis@bernsteinshur.com